John I. Oswald, Appellee, v. Standard Trust and Savings Bank, Appellant.

### Gen. No. 27,626.

1. CORPORATIONS—*liability of bank for conversion of customer's property by vice president.* A bank is liable for the value of shares of corporate stock which plaintiff delivered to the bank's vice president to be sold, whether plaintiff dealt with such vice president in his individual or his official capacity in delivering to him the stock to be sold, where the instructions from plaintiff were simply to sell the stock and credit his account with the proceeds and the vice president was authorized by his superior officer to buy the stock for the bank and where the evidence shows that the bank bought the stock and reissued new certificates for it in the vice president's name and that both officers of the bank regarded the transaction as a bank transaction and not as one with the vice president individually.

2. ASSUMPSIT—*action to recover value of stock purchased by bank after conversion by its officer.* Assumpsit, and not an action in tort, is the proper remedy against a bank for the value of corporate stock which plaintiff delivered to an officer of the bank to be sold for plaintiff's account, whether the dealings between plaintiff and such officer were with the latter in his individual or his official capacity and despite such officer's illegal and unauthorized dealings with such stock before its sale to the bank and with the proceeds of the sale thereafter, where the bank itself regularly bought the stock for its own account and where there was no conversion or wrongful detention of the stock by the bank,

(138)

although such officer, after the sale, appropriated the proceeds to his own use.

3. CORPORATIONS—*when liability on purchase of corporate stock not affected by matters extraneous to purchase.* A bank which bought corporate stock owned by plaintiff which he had delivered to one of the bank's officers to be sold is not released from liability to the plaintiff for the value of such stock or the purchase price thereof, which was misappropriated by such bank officer, by the fact that the president of the bank, in authorizing such officer to buy the stock for the bank gave the authorization without having knowledge of plaintiff's letter of instructions, which was addressed to such officer individually, or of such officer's illegal dealings with the stock in the period between the delivery of it to him and the purchase by the bank, where, at all times, such officer recognized plaintiff's title to the stock in his transactions with his superior officer and the purchase was made by the bank on that basis, and the illegal acts of the officer did not divest plaintiff's title.

4. CORPORATIONS—*liability for fraud of officer.* Plaintiff's right of action for the value of corporate stock which he delivered to an officer of defendant bank to be sold, and which the bank bought, is against the bank and not against a third person to whom such bank officer had given his personal checks as purported payment of the purchase price of such stock to be delivered by such third person to plaintiff, where the evidence shows that although such third person was to be notified of sale of plaintiff's stock he was not authorized by plaintiff to receive payment, and that such officer delivered the checks to him as part of a device to cover up his own illegal dealings with the stock and the proceeds thereof and that such third person acted innocently and in good faith in receiving such checks and attempting to collect them for plaintiff to whom he delivered them upon discovering their worthlessness, and it is immaterial that plaintiff retained possession of such worthless checks.

5. HARMLESS ERROR—*erroneous admission of evidence not affecting result.* In an action against a bank for the purchase price of corporate stock bought by it from plaintiff, the proceeds of which were appropriated by an officer of the bank to his own use, defendant is not prejudiced by the admission of evidence of prior dealings by such officer in which he sustained losses, where no other judgment than one for plaintiff could have been reached on the admitted facts.

Appeal by defendant from the Superior Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1922. Affirmed. Opinion filed December 5, 1922. Rehearing denied December 15, 1922.

CASTLE, WILLIAMS, LONG & CASTLE, for appellant; J. R. LONG, of counsel.

ATWOOD, PEASE, LOUCKS & PETERSON, for appellee.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This is an appeal from a judgment for $4,200 recovered in an action of assumpsit. The declaration contained the common counts and two special counts. One of the latter is predicated upon the theory of a sale of stock in defendant's bank owned by plaintiff, pursuant to an agreement therefor with appellant through Miles, appellant's vice president, and a failure to account therefor. Defendant filed the plea of nonassumpsit to the entire declaration, and a plea denying that Miles was acting as its vice president in the transaction.

The main points urged for reversal are that appellee's transaction was with Miles in his individual capacity and not as appellant's vice president, that there was no sale of the stock, and that plaintiff's remedy against the bank, if any, was in tort and not assumpsit.

The controlling facts are undisputed. On November 8, 1919, plaintiff, who owned twenty-five shares of stock in defendant company, went to its bank and there at the desk occupied by Miles in his official capacity, conferred with him respecting the sale of the stock. As a result of the conference he left his certificate with Miles with the request to sell the stock at $168 to $170 a share and credit his deposit account with the bank. He drew up a written memorandum in duplicate which was signed and reads as follows:

"Chicago, November 8, '19.
Mr. James M. Miles.
Dear Sir:
Herewith I hand you 25 shares of the Standard

Trust & Savings Bank stock, with the request that you sell them for me at $170 to $168 per share and credit my account for same.

As soon as sold will you kindly notify Mr. Dingle?

Thanking you for many favors, I remain

Yours very truly,

JOHN I. OSWALD.

Received the above described stock.

J. M. MILES.''

The next day Oswald left for California and heard nothing further about the matter until November 24. On November 10, Miles pledged said stock to secure a loan to himself of $3,600 from the National City Bank, for which he gave his individual note. Shortly afterwards he withdrew the certificate from said bank on giving a trust receipt therefor. With the stock in his possession he then made known to Castle, appellant's president, Oswald's desire to sell the same. Castle thereupon authorized its purchase, and thereupon the stock was transferred in Miles' name, manifestly for the use of the bank, in the form of two certificates, for ten and fifteen shares, respectively, which were signed by Castle as president. Without appellant's knowledge or consent Miles later pledged the new certificates with another bank, the Central Trust Company of Illinois, to secure his personal note to that bank for $3,000. Shortly afterwards, on November 21, he absconded. Three days later appellant, learning of the last-mentioned transaction, purchased Miles' note for $3,000 and received back said stock certificates. Later plaintiff demanded either the stock or its value, which it is agreed was $168 per share or $4,200, the price at which plaintiff authorized Miles to sell it, and also the amount of the judgment.

Appellant has never returned or offered to return the stock or to pay for the same.

In arguing that appellant's transaction was one with Miles in the latter's individual capacity, appel-

lant lays much stress upon the fact that in the negotiations between them each used the words ''I'' and ''you'' as they would in a personal transaction, and that the letter of November 8 does not purport to be a transaction with Miles in his official capacity. Both Oswald and Miles testified that the transaction was intended to be one with the bank, and all the circumstances, previous and subsequent, support their testimony. Oswald had been a customer of the bank and a depositor therein since its organization. In most of his transactions with it he dealt with Miles or his predecessors in office. Miles' desk was at the railing along the lobby where customers came to do business with the bank, and it is conceded that his position there was an invitation to deal with him in his official capacity. Oswald had previously dealt with him in such capacity in a similar transaction whereby Miles sold certain other bank stock for him and credited the amount of the sale to his account. Certain irregularities on Miles' part in that transaction did not, however, affect the fact that it was a bank transaction. Oswald requested Miles to do the same in this transaction as he did in that, meaning to sell his stock and credit the proceeds to his deposit account. As bearing on the interpretation of the letter of November 8, it appeared that Oswald had never had any personal transactions or social relations or any personal account with Miles, and that the latter had conferred no favors upon him except in his capacity of vice president.

But the capacity in which Miles acted in receiving the stock seems immaterial in view of the fact that he was authorized to sell it and the bank bought it. Both he and Castle regarded the subsequent transaction whereby the bank took Oswald's stock and reissued new certificates therefor to Miles as a bank transaction. That Castle so regarded it conclusively appears from his letter to Oswald of December 1, 1919, in which he said:

"It is observed by your letter that about November 8 you delivered a certificate for 25 shares of stock of this bank to Miles with instructions to sell it and place the proceeds to your account. He had spoken to me about it. I told him to pay you the market price for it, that we were having a demand for the stock and would no doubt be able to dispose of it. * * * I supposed that he had paid you for it as we subsequently, within a day or two, had an order for fifteen shares and expected to fill the order from that certificate. My first information that the stock had not been purchased with the bank's money came through him after the bank examiners had come to audit the bank on November 18."

From Castle's own admission in that letter he authorized the purchase of the stock for the bank at the market price, expected it to be paid for with the bank's money and supposed the payment had been made. There can be no question that the bank then obtained title to Oswald's stock. The title passed out of Oswald to Miles as trustee for the bank and the bank thereby became obligated to pay for it. We cannot agree, therefore, with the contention that it was an individual transaction with Miles or that there was no sale of the stock.

Appellant's contention that as the bank never received any money or money's worth for the stock there can be no recovery in assumpsit is based either upon the theory that it merely took the stock for sale and never sold it, or that Miles and not appellant obtained title to the stock. Neither theory is in accordance with the facts. Whether Miles originally took the stock to act for the bank or himself in selling it, the bank eventually bought it. There is no room, therefore, for the contention that plaintiff's remedy against defendant, if any, was in tort for there was neither conversion nor wrongful detention of the stock by the bank. Appellant's authorities as to when an action in tort is the remedy are not applicable to the present facts.

It also seems to be the contention of appellant that the bank could escape liability on the ground that when Castle authorized the purchase of appellee's stock and reissued new certificates he had no knowledge of Oswald's letter of November 8 to Miles, or of Miles' previous dealings with the stock. But neither of these matters changed or affected the character of the bank's transaction in purchasing the stock. Miles got no title thereto under the letter of November 8, or by assuming ownership in pledging it to the National City Bank. Neither the letter nor the pledge changed the fact that Oswald still had title to the stock and had authorized Miles to sell it, as was properly inferred by Castle when he directed its purchase. The issuance of the new certificates to Miles was manifestly for the bank's convenience and Miles was in no position to question its title. In fact, he never assumed to be the purchaser. On the contrary, he recognized Oswald's ownership when he presented the matter to Castle. As the title then passed to Miles for the bank, Oswald was not concerned with the subsequent dealings with the reissued stock.

Equally untenable is appellant's contention that Oswald's sole right of action is against Dingle. This contention is based on these facts: Oswald had previously taken out annuity insurance through Dingle, to whom he was introduced by Miles. When he delivered the stock to Miles he intimated to him that if it was sold he might take out more insurance through Dingle, and, having talked with Dingle about it, requested Miles to notify Dingle when he sold it. This request was verbal as well as in the letter of November 8. He did not, however, make any definite arrangement with Dingle to take out more insurance. Taking advantage of this circumstance in his effort to cover up his fraudulent transactions, Miles asked Dingle, just before he absconded, without the latter's

knowledge of his purpose, to go with him to the National City Bank. There Miles called for the canceled cashier's checks to his order, which evidenced the loan of said bank to him for $3,600, and falsely stating to Dingle that they represented part of the purchase money for Oswald's stock, induced Dingle to indorse said checks and take his personal checks on appellant's bank for $3,600, saying that he would pay the balance of $400 in cash. Dingle innocently complied with Miles' request and put the latter's checks through the clearing house, only to find that they were worthless. He then wired Oswald in California of the situation, and later handed him the worthless checks.

There is no pretension that Dingle had made any definite arrangements for another policy whereby Oswald became obligated to him, or that Oswald ever authorized payment to him of the proceeds of the sale of the stock. The procurement of Dingle's signature to said cashier's checks and the delivery of Miles' worthless checks to him constituted a mere device on the part of Miles to cover up his irregular transactions and make it appear that he had sold the stock to the National City Bank and paid the proceeds to Dingle. While Oswald's purpose in retaining Miles' worthless checks, which Dingle had indorsed for collection, was not disclosed, that fact alone or taken in connection with the preceding facts does not show that Oswald had a right of action against Dingle or proposed to assert one. That upon such a state of facts appellant is released from liability is too preposterous for consideration.

Complaint is made of the admission of evidence of Miles' prior dealings whereby he incurred losses which probably led to his irregular dealings with said stock. Without discussing its relevancy or irrelevancy we are convinced that no other judgment could have been reached upon the admitted facts and, therefore, that the admission of such testimony, if im-

proper, was not reversible error. While we also think that parol evidence to show the capacity in which Miles acted in receiving Oswald's stock for sale was properly admitted we need not discuss it in view of our conclusion that the bank subsequently bought and acquired good title to the stock.

We think, therefore, that under the implied obligation of the bank to pay for the stock there was a proper recovery in this case, especially under the special count referred to.

*Affirmed.*

MORRILL and GRIDLEY, JJ., concur.